JOURNAL ENTRY and OPINION
{¶ 1} The court entered a judgment of conviction against defendant Jennifer Veselsky on one count of permitting child abuse, a violation of R.C. 2903.15, and one count of endangering children, a violation of R.C.2919.22. Both counts were third degree felonies and arose after Veselsky's five-month-old son required medical treatment for shaken baby syndrome. In this appeal, Veselsky complains that the court lacked sufficient evidence to find her guilty on either count, and that the court erred by sentencing her, a first-time offender, to more than the minimum term of incarceration.
 I {¶ 2} Our review of the sufficiency of the evidence to support a criminal conviction "is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the [appellant's] guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Statev. Moore, 81 Ohio St.3d 22, 40, 1998-Ohio-441, 689 N.E.2d 1. Thus, for us to sustain Veselsky's argument, we would have to determine that no rational trier of fact could find the essential elements of either permitting child abuse or endangering children.
 A {¶ 3} The state presented compelling evidence to show that the child suffered from shaken baby syndrome. The uncontradicted evidence showed that on August 30, 2003, Veselsky and her boyfriend (now husband) Scott Woodson, called the child's pediatrician to complain that the child would neither waken nor open his eyes. A nurse relayed the complaint to the pediatrician, and the pediatrician told his nurse that the family should call 911 and seek immediate medical assistance. The pediatrician recalled that "there was seemingly some resistance to calling 911 at that point in time and I insisted that they do call 911."
 {¶ 4} The evidence showed that the parents did not take the child to the emergency room. They later told medical personnel that the child awoke soon after the call to the pediatrician and appeared responsive. The parents were en route to the hospital with the child but decided to turn around because of the change in his condition.
 {¶ 5} The pediatrician's office next saw the child three days later, on September 2, 2003. The parents brought the child in with complaints that he had a runny nose, cough of three days' duration, and a slight fever. The physician's assistant saw the child and diagnosed an upper respiratory infection. The parents were instructed to give the child standard over-the-counter medications.
 {¶ 6} On September 5, 2003, the parents brought the child to the emergency room. The child appeared to be having seizures, and one of his pupils had dilated to twice the size of the other. These symptoms indicated possible neurological problems. Both parents denied knowledge of any specific trauma to the child, and Veselsky told a nurse that she had left the child in her boyfriend's care while she went to work that day.
 {¶ 7} Because of the child's poor condition, the doctor in charge of the emergency room ordered a CT scan of the child's brain. The scan showed a grossly abnormal concentration of blood within the brain. This collection of blood, called a subdural hematoma, gave three different indications for the date of the trauma. The doctor who interpreted the CT scan concluded that the different indications of blood within the brain meant that the child had suffered trauma on three different occasions: between 12 and 24 hours prior to the CT scan; between three to five days before the CT scan; and more than seven days before the CT scan. These results led the doctor interpreting the results to conclude that the child suffered from shaken baby syndrome.
 {¶ 8} This diagnosis of shaken baby syndrome led the emergency room doctor to have the child transferred to another hospital. At the second hospital, a neurosurgeon relieved the pressure on the child's brain by draining two blood clots — one of recent derivation; the other being of longer-standing derivation. The surgeon attempted to determine whether the trauma to the brain had a benign origin, but all of the indications led away from that supposition. In short, the surgeon's findings were consistent with the emergency room physician's diagnosis of shaken baby syndrome. At trial, the surgeon gave his opinion, to a degree of medical certainty, that the child's head injuries were "inflicted."
 {¶ 9} As the child recovered from surgery, the Cuyahoga County Department of Children and Family Services intervened. The agency assigned a social worker who in 1999 had been assigned to an abuse case involving the child's older sister. The social worker recalled that the sister had suffered from multiple fractures to her head and torso area. These injuries were thought to be a result of shaken baby syndrome. As a result of allegations made against him relating to the abuse of the sister, Veselsky's boyfriend pleaded guilty to two counts of attempted endangering children.
 {¶ 10} The social worker testified that neither parent recognized her, despite having dealt with her four years earlier. The boyfriend refused to speak to the social worker without having his attorney present, and Veselsky gave nonverbal indications that she, too, would not discuss the particulars of what happened without an attorney present. Veselsky later told the social worker that she did not harm the child and did not know who did. The social worker found Veselsky to be oddly unaffected during the medical procedure, expressing no real emotion and not interacting with the boyfriend.
 {¶ 11} Veselsky did not testify. Prior to trial, she submitted the report of an expert who gave the opinion that the child suffered from a severe reaction to vaccines which were negligently administered just days before he lapsed into the coma. The expert did not testify, but the state asked its own experts questions about the report's conclusions, although it did not offer the report into evidence.
 {¶ 12} The boyfriend testified in his own defense (he and Veselsky were tried together) and denied any culpability. He said that he had been home with the child while recovering from an injury, but that he did nothing to injure the child.
 B {¶ 13} R.C. 2903.15(A) states:
 {¶ 14} "(A) No parent, guardian, custodian, or person having custody of a child under eighteen years of age or of a mentally or physically handicapped child under twenty-one years of age shall cause serious physical harm to the child, or the death of the child, as a proximate result of permitting the child to be abused, to be tortured, to be administered corporal punishment or other physical disciplinary measure, or to be physically restrained in a cruel manner or for a prolonged period."
 {¶ 15} There is no question that Veselsky is a parent having custody of the child, and that the state presented compelling evidence to show that the child suffered from shaken baby syndrome — a very clear form of "serious physical harm." The sole issue is whether the child suffered this harm as a proximate result of Veselsky permitting the child to be abused. In other words, could a rational trier of fact have found that Veselsky permitted the child to be abused?
 {¶ 16} The state's theory of the case was that Veselsky must have known that abuse occurred prior to the child suffering a seizure, but did nothing to stop it, the inference being that she allowed the abuse to continue. It put on a great deal of circumstantial evidence to that effect.
 {¶ 17} The state established that Veselsky's first child had suffered from shaken baby syndrome at the hands of Veselsky's boyfriend. Indeed, the boyfriend testified that both he and Veselsky conducted a great deal of research into shaken baby syndrome — the inference being that Veselsky should have known the syndrome when she saw it.
 {¶ 18} Veselsky would have next seen shaken baby syndrome on August 30th. The child was unresponsive — a classic symptom — and Veselsky at least knew enough to call the child's pediatrician to seek assistance, thus demonstrating that she knew something was seriously amiss with the child. Inexplicably, she ignored the doctor's advice to call an ambulance, and instead decided to drive the child to the hospital herself. When the child did become responsive, she turned around rather than have the child examined. This incident corresponded to testimony by the surgeon that blood clotting within the child's brain had occurred three to five days before the CT scan. Hence, a reasonable trier of fact could have found that the child suffered from shaken baby syndrome on August 30th; that Veselsky, with her past experience and knowledge of the syndrome, at least recognized that something had happened to the child; and that Veselsky very curiously ignored a pediatrician's advice to get the child examined when it might have meant exposing the child to medical personnel who could definitively state that the child had been shaken.
 {¶ 19} The state also showed that in the days following this incident, the child suffered from a cold and had been left in the care of the boyfriend, who himself had been recovering from an injury. A reasonable trier of fact could find that the combination of leaving a sick child (with all the attendant stress occasioned thereby) with an admitted abuser, and an incident occurring just days earlier would have left Veselsky in the position of knowing that something would happen to the child. In fact, the medical evidence showed clotting occurring between 12 and 24 hours prior to the September 5th CT scan.
 {¶ 20} Viewing this evidence in a light most favorable to the state, we find that a reasonable trier of fact could have concluded that the August 30th incident alerted Veselsky to the fact that the child had been abused on that date. Instead of removing the child to safety, or dealing directly with the threat (that is, the boyfriend), Veselsky continued to leave the child in the boyfriend's care, thus permitting the child to be abused again. There was evidence going to the essential elements of R.C.2903.15(A).
 C {¶ 21} R.C. 2919.22(A) states:
 {¶ 22} "(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. * * *."
 {¶ 23} Whereas R.C. 2903.15(A) relates to conduct that causes serious physical harm to a child, R.C. 2919.22(A) relates to a failure to perform the normal duties associated with parenting that create a risk of harm to the child — that is, neglect. See State v. Kamel (1984), 12 Ohio St.3d 306,308-309. Hence, "* * * an inexcusable failure to act in discharge of one's duty to protect a child where such failure to act results in a substantial risk to the child's health or safety is an offense under R.C. 2919.22(A)." Id. at 309.
 {¶ 24} As we previously detailed, the evidence showed that Veselsky knew that her boyfriend had a history of abusing children after he pleaded guilty to attempted child endangering. Despite this, she continued to live with him and bore him a second child. She did so despite knowing that conditions of the boyfriend's ability to visit the sister upon his release from prison consisted of him obtaining anger management counseling, parenting counseling and individual therapy. He completed none of the requirements and instead moved back with Veselsky immediately upon his release from prison.
 {¶ 25} When the child manifested signs of shaken baby syndrome after being left with the boyfriend, Veselsky decided against following through with medical care for the child. And her detached behavior at the hospital, consisting primarily of denying any involvement in the child's injuries, could have led a reasonable trier of fact to conclude that she was deflecting blame away from herself and onto the boyfriend. These denials could have led the court to conclude that Veselsky knew that she made a huge mistake by leaving the child with the boyfriend. Even if Veselsky were unsure of what happened to the child on August 30th, the facts known to her at the time created a duty to remove the child from the boyfriend's care. Sadly, her failure to do so led to the harm caused on September 5th. We find no basis for concluding that a reasonable trier of fact would not have the found the essential elements of endangering a child proven beyond a reasonable doubt.
 II {¶ 26} The court sentenced Veselsky, a first time offender, to four-year terms of incarceration, more than the one-year shortest term of incarceration available for a third degree felony. Veselsky complains that the court erred by failing to make a finding that the shortest term of incarceration would demean the seriousness of her conduct or would not adequately protect the public from future crime by her.
 {¶ 27} The state concedes that the court did not use the exact language of R.C. 2929.14(B) to the effect that "the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others." It correctly notes, however, that we do not require the court to utter "magic" words when imposing more than the minimum sentence. SeeState v. Cvijetinovic, Cuyahoga App. No. 81534, 2003-Ohio-563; State v.Gerogakopoulos, Cuyahoga App. No. 81934, 2003-Ohio-4341; State v.Stribling (Dec. 10, 1998), Cuyahoga App. No. 74715.
 {¶ 28} The court made the following remarks at sentencing:
 {¶ 29} "I did consider a minimum sentence, even a probationary term, but I don't believe that would have been appropriate under the circumstances.
 {¶ 30} "I think the harm here is tremendous harm. This child nearly died, this second child. This happened because you violated a court order. Troy Woodson suffered serious physical harm.
 {¶ 31} "We don't know the long term consequences, but we know that he will never be a normal child again. That has been provided to me. So we have considered the minimum. I don't think it would be appropriate considering the significance of this offense.
 {¶ 32} "It would not act as a deterrent to others similarly situated. That's why a jail term was necessary even though she was a first offender."
 {¶ 33} Taken in context, the court's remarks show that it believed the shortest prison term would demean the seriousness of Veselsky's conduct. While the court did not need to set forth reasons for its findings, we nonetheless understand the court's remarks to demonstrate its concern over the harm caused to the child. On this record, we find the court satisfied R.C. 2929.14(B)(2).
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Dyke, P.J., and Kilbane, J., concur.